Robert J. DAVIDSON, Jr., Plaintiff,

v.

John L. COOK, et al., Defendants,

v.

AETNA LIFE & CASUALTY CO., et al.,
Third-Party Defendants.

Civ. A. No. 81–0913–R.

United States District Court,
E.D. Virginia,
Richmond Division.

June 30, 1983.

William N. Pollard, C. Allen Riggins, Parker, Pollard & Brown, Richmond, Va., Richard J. Clair, Nat. Right to Work Legal Defense Foundation, Inc., Springfield, Va., for plaintiff.

Robert E. Paul, Paul & Thompson, Arlington, Va., Gerald M. Feder, Timothy St. C. Smith, Feder & Edes, Washington, D.C., for defendants Wilson, Jernigan, Parker, Singer and Gifford.

Archibald Wallace, G. Edgar Dawson, Richmond, Va., for Shirley A. Zahn.

Jay J. Levit, Levit & Mann, Richmond, Va., for John L. Cook, et al.

Louis A. Mezzullo, James F. Stutts, Jack W. Burtch, Jr., McSweeney, Stutts & Burtch, Richmond, Va., for Joseph Accardi and Reginald E. Baker.

Anthony F. Troy, John M. Gray, Mays, Valentine, Davenport & Moore, Richmond, Va., for Mark I. Singer.

Hullihen W. Moore and James W. Tredway, III, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for Joseph R. Jernigan and Charles P. Wilson.

Francis T. Eck, Hooker & Eck, Richmond, Va., for Robert N. Parker III.

John G. Conlan, Wells, Axselle, Hundley & Johnson, Roy M. Terry, Jr., Richmond, Va., for William Frank Gifford, Sr.

Joseph C. Kearfott, Hunton & Williams, Richmond, Va., for non-parties re: Subpoenaes Duces Tecum.

Thomas M. Hogan, Mahoney, Hogan, Heffler & Heald, McLean, Va., for third party defendants.

Gregory S. Hooe, Cohen, Abeloff & Staples, Richmond, Va., for John A. Koch.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. No. 93–406, 88 Stat. 829 (codified as amended in 5 U.S.C. § 5108(f), scattered sections of 26 U.S.C., and 29 U.S.C. § 1001 *et seq.*). Jurisdiction is conferred upon the Court by ERISA § 502(e), (f), 29 U.S.C. § 1132(e), (f). Following massive discovery and seemingly infinite motions, some of which were necessary, the parties stipulated to the pertinent facts [1] and argued the case to the Court. Several hundred pages of briefing later, the matter is ripe for decision. This memorandum constitutes the Court's findings of fact and conclusions of law for purposes of Fed. R.Civ.P. 52(a).

Plaintiff is a participant in the Local 666 Benefit Trust Fund ("the Fund"), which provides health and welfare benefits to certain electrical workers and their families; he brings this action "as a participant in, and for and on behalf of," the Fund. Plaintiff is a former member of Local Union 666, International Brotherhood of Electrical Workers of Richmond, Virginia, AFL–CIO ("the Local"), one of the parties that established the Fund in 1968.[2] The Fund is an "employee welfare benefit plan" and an "employee benefit plan" within the meaning of ERISA § 3(1), (3), 29 U.S.C. § 1002(1), (3), and accordingly is covered by ERISA's provisions as to fiduciary responsibility and as to reporting and disclosure. Defendants Accardi, Baker, Cook, Koch, Nash, and Van Fossen [3] were Trustees of the Fund from at least 1974 until at least June of 1976. Because of their initial involvement with a loan that is the subject of this action, they are hereinafter referred to as the "lending Trustees." Defendants Gifford, Jernigan, Parker, Singer, and Wilson are the current Trustees.[4] Defendants Bowles and Noonan served as Trustees following the terms of two lending Trustees, but are no longer Trustees. All of these defendants have been named "personally and as Trustees and former Trustees" of

1. The stipulations do not apply to the third-party action and do not extend to the relevance of any fact or document included.

2. The other party to the agreement establishing the Fund is the Capitol Division, Virginia Chapter, National Electrical Contractors Association ("NECA"). The Fund covers the employees of NECA contractors. NECA appoints three Trustees, and the Local appoints the other three.

3. Defendant Van Fossen ceased to serve as a Trustee in August 1976, then served again as Trustee from June 1981 until October 1981.

4. One of the six Trustee positions is currently vacant.

the Fund.[5] Defendant Shirley A. Zahn is the administratrix of the estate of Willie M. Zahn, who served as administrator of the Fund from some time before its official inception in 1968 until 1980. For convenience and simplicity, the Court hereinafter refers to Willie M. Zahn as if he were the named defendant.

## I. *Factual Background*

In 1971, the Local set up a Building Committee to investigate purchasing land and constructing a building thereon to serve as headquarters for the Local. Pursuant to official policy of the International Brotherhood of Electrical Workers, the Local incorporated a subsidiary to hold title to the property and building; the Local intended to insulate itself from responsibility for the building corporation's debts. Thus, on September 22, 1972, Richmond Electricians Building Corporation ("REBCOR"), wholly owned by the Local, was chartered under the laws of Virginia. The President, Vice President, Treasurer, and Recording Secretary of the Local hold corresponding offices in REBCOR; together with three individuals elected at large by the Local, they constitute REBCOR's Board of Directors.

In March 1973, REBCOR agreed to, and subsequently did, purchase a parcel of land at 1701 East Parham Road, Richmond, Virginia, for $137,500. Some time during the spring of 1974, Zahn and the president of REBCOR inquired about a construction loan from a commercial lender, but did not receive one. On May 23, 1974, the president of REBCOR executed a $1,757,500 contract for the construction of the REBCOR building on the Parham Road property. By August 1974, construction had begun.

As early as November 2, 1972, the Trustees had discussed lending money to REBCOR on a first mortgage note and had agreed to negotiate with REBCOR in that regard. The minutes of the Local's meeting of February 1, 1974 show that Zahn reported that the cost of building was rising and, contrary to earlier reports, there was anticipated to be enough rental space to support the building "but not to pay the mortgage. Hopefully the Benefit Trust Fund will lend us the money." On June 7, 1974, a non-quorum group of the Trustees [6] adopted a motion to negotiate the financing subject to the following conditions:

> Our attorney should draw up the loan document on a first-mortgage basis, and when this is complete a committee of three, namely the administrator, the chairman, and the secretary of the Trust Fund meet with the attorney to review the loan document in order that a complete understanding may be had of its terms and conditions. After this is done, if the loan meets the approval of the committee of three, the entire trustees at a meeting would be presented copies for their final approval.

The Local held a membership meeting that night and announced that the Trustees had agreed to negotiate with REBCOR as to a loan.

As per the June 7, 1974 motion, the committee of three sought legal counsel as to the propriety of making the loan.[7] At the

5. At no time has any party suggested any theory under which any Trustee could be liable for any actions other than those taken in his capacity as Trustee. Nonetheless, the majority of the Trustee defendants have employed separate counsel to represent them in their individual capacities. These attorneys have merely further developed the defenses available to the defendants as Trustees. Of course, parties are free to hire as much legal representation as they deem appropriate, but they may, as in the instant case, anticipate problems if they subsequently seek to have the opposing parties pay for such representation.

6. The Declaration of Trust required at least two Trustees appointed by the Local and two ap-

pointed by NECA to be present to constitute a quorum at a Trustees' meeting. Only one Trustee appointed by NECA was present at the June 7, 1974 meeting, along with Zahn and the three Trustees appointed by the Local.

7. Zahn received the following letter dated October 31, 1974 from the Fund's legal counsel:

Dear Mr. Zahn:

This is in further response to your inquiry regarding the proposed loan from the trust to the Richmond Electrician's Building Corporation, a wholly-owned subsidiary of the local. You indicate that as evidenced by minutes of the trustees of the trust, the trust had committed to make the loan before July 1, 1974,

Trustees' meeting on December 13, 1974, chairman Accardi reported that according to their legal counsel, making the loan "was not contrary to the Pension Reform Act." All six Trustees (Accardi, Baker, Cook, Koch, Nash, and Van Fossen) then voted to lend REBCOR one million dollars at 10% annual interest, the interest to be paid monthly, and to consider lending further funds later if they were needed. At the same meeting, the Trustees received a report showing that the Fund's total cash assets were $1,479,738.29. At that time, Fund administrator Zahn and Trustees Nash and Van Fossen were also directors of REBCOR.

On January 23, 1975, the president of REBCOR executed a Deed of Trust on the property and a Deed of Trust note for $1,000,000. The note provided that interest at 10% per annum was to be paid monthly beginning March 1, 1975. The Deed of Trust reflected the parties' intention that the interest rate be adjusted from time to time, though it provided no mechanism for doing so. In the event of a late interest payment, REBCOR was to pay a penalty of 5% of the payment. The principal was due on demand, and in any event was to be paid by June 30, 1984.

At the August 25, 1975 Trustees' meeting, it was concluded that REBCOR needed to borrow approximately $400,000 more to complete construction of the building. The five Trustees present (Baker was unable to attend) voted to increase the loan to $1,400,-000. At this meeting, the Trustees received a report indicating the Fund's total cash assets were $1,467,133.33. As of this time, REBCOR had made only two of the seven interest payments that had come due; it owed over $10,000 in interest and penalties. There is nothing to warrant a conclusion that the Trustees knew of these delinquencies, although administrator Zahn, who had responsibility for recording the interest payments, obviously knew.

On October 20, 1975, REBCOR officers executed a Supplemental Deed of Trust and a Supplemental Deed of Trust note. The note increased the indebtedness to $1,500,-000, rather than the $1,400,000 agreed to at the August 24, 1975 Trustees' meeting. The note did not require REBCOR to reimburse the Fund for the interest on any borrowing the Fund might have to undertake as a result of having so much of its assets tied up in the REBCOR loan; at the August 24, 1975 Trustees' meeting, the Trustees had made the loan increase conditional on that requirement being imposed on REBCOR. Through March 1976, a total of at least $1,411,075.25 was disbursed under the loan, as supplemented.

REBCOR made no further interest payments from October 1975 through December 1976. On January 17, 1977, the Trustees held a meeting at which they learned that the interest payments were delinquent, and they directed Zahn to provide them an

which committment had been relied on by Richmond Electrician's Building Corporation and by the local in its construction of the building.

Section 414(c)(1) of the Employee Retirement Income Security Act of 1974, relating to the effective date of the new prohibited transaction rules, provides as follows:

. . . .

While there are no regulations or other administrative interpretations under the above quoted provision, the phrase "binding contract" may be interpreted to include a situation such as that existing as the result of the action of the trustees of the trust before July 1, 1974, in reliance on which action has been taken by the Richmond Electrician's Building Corporation. If this interpretation is finally adopted, then the making of the loan would not constitute a prohibited transaction under the new rules until June 30, 1984, provided the other requirements of Section 414(c)(1) of the Act are met.

It should be noted that Section 414(c)(1) requires that the transaction not violate the prohibited transaction rules of existing law (Section 503(b) of the Internal Revenue Code of 1954) as well as that the transaction must be on terms as favorable as an arm's-length transaction. For your guidance in structuring the transaction, I am enclosing a copy of Section 503(b) of the Internal Revenue Code of 1954. However, I am not sure that Section 503(b) of the Code adds anything to the arms-length requirement and it might be argued that the corporation is not so related to the trust as to give rise to the application of Section 503(b).

With best regards, . . . .

up-to-date accounting of the loan status. By that time, REBCOR had accrued at least $151,937.09 in interest and $9,227.39 in penalties. There followed various correspondence among the Trustees and Zahn, meetings, an appraisal of the property, and, on February 28, 1977, a meeting of the Trustees[8] and the president of REBCOR. At that meeting, the REBCOR president proposed a solution to the delinquency problem. Further discussions, correspondence, and meetings ensued, and at their June 16, 1977 meeting, the Trustees agreed to the following "cure": $86,196.81 of the unpaid interest was converted to principal, to make the total principal $1,500,000, as authorized by the Supplemental Deed of Trust note; the remaining $42,266.39 in unpaid interest was due; collection of the $7,874.72 in penalties was postponed for three years and would be waived altogether if the interest payments were kept current throughout that period.

In June 1980, the Trustees waived the late payment penalties, finding that REBCOR had kept up its interest payments over the three years since the cure.[9] In the time since the cure, the building has again been appraised. Some negotiations have taken place concerning the possible sale of the building, but it has not been sold. Though requested to do so, REBCOR has never provided a schedule for the repayment of the loan principal; REBCOR has, however, made a total of $200,000 in payments on the $1,500,000 principal.

## II. Allegations

It is not surprising that the contentions in plaintiff's trial brief do not perfectly correspond to those he had set forth in his complaint 15 months and many reams of pleadings earlier. Thus, plaintiff has moved pursuant to Fed.R.Civ.P. 15(b) to amend the pleadings to conform to the evidence. The Court assumes that the contentions set forth in the trial brief are those plaintiff avers he has proved.

### A. Fiduciary duties: ERISA § 404, 29 U.S.C. § 1104.

■ Under 29 U.S.C. § 1104(a)(1)(A)(i), a fiduciary is required to discharge his duties for the exclusive purpose of providing benefits to participants and their beneficiaries. Plaintiff alleges each of the Trustees and Zahn violated this provision by providing a "sweetheart" loan to REBCOR and the Local, following their wishes rather than acting in the interest of the participants and beneficiaries.

Plaintiff alleges each of the Trustees and Zahn violated 29 U.S.C. § 1104(a)(1)(B), which requires a fiduciary to discharge his duties in the same manner as a "prudent man acting in a like capacity and familiar with such matters" would act. Plaintiff alleges that the lending Trustees and Zahn failed to investigate REBCOR and the proposed building and failed to require assurances of payment as a prudent real estate lender would have done with regard to the original $1 million loan and the later supplemental loan of up to $500,000. He alleges that Zahn and the Trustees in office at the time of the cure[10] similarly failed to get proper documentation and guarantees. And he alleges that Zahn and the current Trustees have continued to violate this provision by failing to increase the interest rate, obtain a principal repayment schedule, seek sureties for the loan, etc.

■ Pursuant to 29 U.S.C. § 1104(a)(1)(C), the fiduciaries must diversify the plan's investments "unless under the

---

**8.** By this time, defendant Bowles had replaced defendant Cook as Trustee; Noonan had replaced Nash; Jernigan had replaced Van Fossen; Wilson had replaced Koch; and Baker had resigned as Trustee, but had not been replaced.

**9.** Plaintiff disputes that the payments were in fact timely made. Defendants contend that at least some of the payments appear on the books to have been late only because Zahn was late in recording them. Plaintiff has not satis-fied the Court by a preponderance of the evidence that REBCOR violated the terms of the cure in such a way that the Trustees should not have waived the penalties.

**10.** By the June 16, 1977 meeting at which the Trustees agreed to the cure, defendant Parker had taken the Trustee position defendant Baker had vacated, so the Board consisted of Accardi, Bowles, Jernigan, Noonan, Parker, and Wilson.

circumstances it is clearly prudent not to do so." The original loan committed over 67% of the Fund's assets to the REBCOR loan, and the supplemental loan and cure brought the level to something on the order of 95%. Plaintiff seeks to hold liable Zahn and the Trustees in office as of each of these times.

The final allegations with respect to fiduciary duties flow from 29 U.S.C. § 1104(a)(1)(D), which requires fiduciaries to discharge their duties in accordance with the documents and instruments governing the plan. The Declaration of Trust for the instant Fund requires the Trustees to invest "in accordance with the Prudent Man Statute of the State of Virginia (new Virginia Code Section 26–45.1)." The plaintiff alleges that the original loan, the supplemental loan, and the cure violated this fiduciary standard, as well as that directly set forth in ERISA, by concentrating the Fund's assets in one investment.

**B.** *Liability for breach of co-fiduciary: ERISA § 405, 29 U.S.C. § 1105.*

Pursuant to 29 U.S.C. § 1105(a)(1), a fiduciary is liable for a co-fiduciary's breach of fiduciary duties if he knowingly participates in or conceals such a breach. Plaintiff alleges that throughout the history of the loans, the fiduciaries have engaged in such concealment. This allegation rests largely on the Trustees' failure to take action against Zahn once they learned that he had allowed the interest payments to become delinquent.

Similarly, 29 U.S.C. § 1105(a)(3) requires a fiduciary to make reasonable efforts to remedy any known breach by a co-fiduciary. Plaintiff contends that the fiduciaries had the responsibility to learn of any breaches and then, pursuant to this provision, the duty to remedy them. Plaintiff seeks to attach liability under this section to each of the fiduciaries.

**C.** *Prohibited transactions: ERISA § 406, 29 U.S.C. § 1106.*

Plaintiff alleges that the original loan, supplemental loan, and cure all violated 29 U.S.C. § 1106(a)(1)(B), which forbids a fiduciary to cause the fund to engage in a transaction which he knows or should know constitutes a loan with a party in interest. There is apparently no dispute that REBCOR constituted a "party in interest" within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

As a related matter, 29 U.S.C. § 1106(a)(1)(D) forbids a fiduciary to cause the fund to transfer assets to a party in interest. Plaintiff contends that the 1980 waiver of late payment penalties pursuant to the 1977 cure constituted such a transfer of assets; he seeks to hold the 1977 Trustees, the 1980 Trustees, and Zahn liable under this provision. Plaintiff also seeks to hold the current Trustees and Bowles liable under this section for failing to adjust the interest rate on the loans.

Finally, plaintiff alleges violations of 29 U.S.C. § 1106(b)(2), which prohibits a fiduciary from acting on behalf of a party whose interests are adverse to those of the plan, in a transaction involving the plan. Plaintiff alleges that lending Trustees Nash and Van Fossen and administrator Zahn violated this subsection in transacting the original loan and the supplemental loan because all of them were also on the REBCOR board of directors at the time. Plaintiff also alleges a conflict of interest in the cure: Trustees Bowles and Noonan were also REBCOR directors at the time, and Trustee Jernigan was on the Local's executive board.

**D.** *Current Trustees' cross-claim.*

The current Trustees' cross-claim against the lending Trustees is based largely on the same allegations plaintiff makes. Thus, the current Trustees allege that the lending Trustees breached their fiduciary duties set forth in 29 U.S.C. § 1104(a)(1)(A), (B), and (C) by failing to exercise the required prudence and failing to diversify the investments. They allege that Zahn acted on behalf of an adverse party in violation of 29 U.S.C. § 1106(b)(2). Further, they allege that each cross-claim defendant violated 29 U.S.C. § 1105(a)(2) by allowing fellow fiduciaries to commit breaches.

### III. *Statute of Limitations*

The lending Trustees contend that all claims against them are barred by ERISA § 413, 29 U.S.C. § 1113,[11] the statute of limitations. Under that section, the basic limitation period of six years runs from the date of the breach or violation, except in case of fraud or concealment, when it runs from the date of discovery of the breach or violation. If there is no fraud or concealment, the six-year period can be reduced to three years if the defendant can show the plaintiff had either actual or constructive knowledge of the breach or violation; the three-year period runs from the time the plaintiff gained such knowledge. The kind of constructive knowledge that can reduce the period is that supplied by a report, filed with the Secretary of Labor, from which the plaintiff "could reasonably be expected to have obtained knowledge of such breach or violation."

The basic six-year period runs from the date of the "last action which constituted part of the breach or violation." With regard to the allegations involving the original loan and the supplemental loan, the last action was the last disbursement of funds pursuant to the loans, in March 1976. Plaintiff's action filed October 19, 1981 clearly is not barred by the basic six-year limitation provision.

Nearly all of the current Trustees' cross-claim filed November 4, 1982 equally clearly *is* barred by the six-year provision. The cross-claim is based almost entirely on the granting of the original loan and the supplemental loan. To the extent the cross-claim concerns the administration of the loans after November 4, 1976,[12] it is not barred by the six-year provision. The remainder of the cross-claim, however, will be dismissed.[13]

The lending Trustees seek to reduce the limitation period to three years by showing both actual and constructive knowledge on the part of the plaintiff. In an effort to come under the constructive knowledge provision of ERISA § 413(a)(2)(B), *see* note 11 *supra* and accompanying text, the lending Trustees rely on the Form 5500 for calendar year 1976 which the Fund filed with the Department of Labor in August 1977. That

---

11. § 1113. Limitation of actions

(a) No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date (A) on which the plaintiff had actual knowledge of the breach or violation, or (B) on which a report from which he could reasonably be expected to have obtained knowledge of such breach or violation was filed with the Secretary under this subchapter;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

The defendants seek to take plaintiff at his word when he asserts, "The time is long overdue that these violations should be corrected."

12. The cross-claim allegations concerning administration of the loans involve acts and omissions through January 17, 1977, when Zahn first told the Trustees of the delinquent interest.

13. The Court finds no merit in the current Trustees' arguments for equitable tolling of the six-year period. The current Trustees attempt to apply the date of the original complaint to toll the statute of limitations, as in *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), where members of a class were able to apply the date on which the named plaintiff first filed for class certification. If the current Trustees' theory were adopted, the statute of limitations would never bar a cross-claim where the original complaint was timely filed, since a cross-claim must arise from the same transaction or occurrence, *see* Fed.R.Civ.P. 13(g). The instant cross-claim does not present the kind of equitable considerations that justified tolling the limitation period in *American Pipe.* Nothing in *Crown, Cork & Seal Co. v. Parker,* —— U.S. ——, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), changes the Court's conclusion as to this issue.

On the other hand, the cross-claim defendants have not established actual or constructive knowledge on the part of the current Trustees so as to reduce the limitations period to three years. *See* note 14 *infra* and accompanying text.

form disclosed that the Fund held a party-in-interest investment in a mortgage which had increased from $1,078,531 to $1,413,803 during 1976, that the Fund held a loan which was in default or classified as uncollectable as of the end of the year, and that the Fund had engaged in a transaction or series of transactions involving over 3% of the Fund's assets.[14] Attached to the Form was a schedule which provided certain information about the loan and which incorporated the attached Deed of Trust note and letter setting forth the cure.

The plaintiff contends that this filing does not satisfy ERISA § 413(a)(2)(B) because the attached schedule is misleading as to the value of the collateral for the loan. The schedule states that the value of the collateral based on the actual cost of the land and improvements was $1,933,388. Plaintiff argues that at the time the Trustees filed the Form, they knew the appraised fair market value of the property was no more than $960,000, and that their failure to disclose this valuation of the collateral renders the filing ineffective for purposes of the statute of limitations defense.

Plaintiff offers no authority for this position. Even if the filing could be considered misleading in reporting the actual cost rather than the appraised value of the collateral, it does not follow that the Form cannot provide constructive knowledge as to any of the violations. The Court concludes that in providing the actual cost rather than the appraised value of the collateral, the Trustees simply deprived themselves of the defense they might have established if they had, *inter alia,* disclosed that the loan was under-collateralized: that information might have helped to provide constructive knowledge of the breach of the duty to invest prudently imposed by ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

■ The Court concludes that the Form 5500 filed in August 1977, with the attached schedule and copies of the note and cure letter, is adequate to trigger the three-year statute of limitations as of that date concerning the violations the filing actually disclosed: failure to diversify investments, 29 U.S.C. § 1104(a)(1)(C); failure to follow the plan documents, 29 U.S.C. § 1104(a)(1)(D); engaging in a party-in-interest transaction, 29 U.S.C. § 1106(a)(1)(B); and transfer of assets to a party in interest,[15] 29 U.S.C. § 1106(a)(1)(D). The allegations that the original loan, supplemental loan, and/or cure violated these provisions are time-barred, and they will be dismissed. The Form does not, however, adequately disclose the remaining alleged violations.

■ The lending Trustees also assert that they have established plaintiff had actual knowledge of the alleged violations more than three years before he filed suit, so that his claims are barred by ERISA § 413(a)(2)(A). The defendants point to plaintiff's contacts with the Department of Labor, his attendance at meetings, documents he received, and admissions he has made. To the extent this evidence tends to show plaintiff's actual knowledge, such knowledge mostly relates to allegations the Court has already found to be time-barred because of the Form 5500 filing, such as the

---

**14.** It is not clear to the Court what transaction was being reported here. The preparer of the Form 5500 evidently did not consider the 1976 disbursements under the loan to constitute a "transaction," since the Form indicates the Fund was not involved in any "transactions" with a party in interest in 1976. If the Fund filed a schedule with respect to this transaction, as the instructions for this Item 24(a)(v) specify, it was not included in the copy of the filings submitted to the Court as Exhibit 5B.

With regard to constructive knowledge applicable to the cross-claim, the Court notes that while the Form disclosed that the loan had become delinquent, it did not disclose the manner in which it had been allowed to become so. The Form thus did not provide constructive knowledge of the alleged breach of fiduciary duty inherent in allowing the delinquency to accrue in the manner it did.

**15.** The allegation that the 1977 agreement to waive late penalties constituted a transfer of assets to a party in interest is the only allegation under 29 U.S.C. § 1106(a)(1)(D) that is time-barred; the allegation concerning the actual waiver of penalties in 1980 remains to be considered.

allegation of failure to diversify. Plaintiff admitted in his deposition, however, that as of the time he wrote a letter dated May 31, 1977, he knew that Trustees Noonan and Bowles were at that time also directors of REBCOR.[16] The Court is satisfied that plaintiff had actual knowledge of this conflict of interest[17] in violation of 29 U.S.C. § 1106(b)(2) more than three years before he filed this action, and this allegation is also time-barred. *Wesley v. International Harvester Co.*, No. 2–C 78–4040, slip op. at 9 (W.D.Iowa Oct. 9, 1980).

Plaintiff also admitted in his deposition that he knew the appraised value of the property in 1977.[18] He did not, however, recall whether at that time he also knew the principal amount of the loan. Thus, it is not clear whether he knew the loan was under-collateralized. And even if he was aware of that fact, under-collateralization of a loan does not, by itself, establish a breach of the fiduciary duty to invest prudently. The defendants have not established plaintiff had actual knowledge of the alleged breach of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), more than three years before he filed this action.

## IV. *Violations*

As to the remaining allegations, the Court concludes plaintiff has proved by a preponderance of the evidence that the lending Trustees and Zahn violated specific provisions of ERISA. He has not in this regard carried the burden as to former Trustees Noonan and Bowles or the current Trustees. On the other hand, the current Trustees have established the one part of

their allegations that survived the statute of limitations defense. *See* note 12 *supra* and accompanying text.

## A. *Lending Trustees and Zahn.*

The Court is satisfied that in making both the original and supplemental loans, the lending Trustees and Zahn violated 29 U.S.C. § 1104(a)(1)(A)(i) by not performing their duties for the exclusive purpose of providing benefits to participants and their beneficiaries. Proving purpose or intent is always difficult, and the Court must rely on circumstantial evidence and reasonable inferences to reach its conclusion that the fiduciaries were attempting to also satisfy the desires and needs of the Local.[19] While that purpose is not evil or dishonest, it is not the exclusive purpose to which ERISA fiduciaries must dedicate their efforts. The fiduciaries did not hold the Local's proposal for a loan at arm's length and compare it to other available investments, but instead did their best to accommodate the Local's needs. *Cf. Marshall v. Kelly*, 465 F.Supp. 341, 350 (W.D.Okla.1978) (finding violation of this section by the making of "sweetheart" loans).

The Court is satisfied as well that the lending Trustees and Zahn did not exercise the prudence required by 29 U.S.C. § 1104(a)(1)(B) in making the original and supplemental loans. The plaintiff has set forth a litany of actions the fiduciaries did not take in the course of making the loans, including properly appraising the proposed building, investigating the borrower's financial resources, evaluating the likely

---

16. Exhibit 92I, at 333–34.

17. Plaintiff's admission concerning two of the 1977 Trustees did not indicate he knew that Nash, Van Fossen, and Zahn had had a similar conflict of interest at the time the loans were approved. The allegations concerning these defendants remain to be considered. He also did not indicate he was aware Trustee Jernigan was in 1977 also a member of the Local's executive board. The plaintiff has not satisfied the Court, however, that Jernigan was laboring under a conflict of interest with respect to the loan administration; he has not shown that the executive board was sufficiently involved with

the loan for Jernigan's membership on it to cause a violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

18. Exhibit 92I, at 287.

19. That serving the needs of the Local is not necessarily the same as serving the needs of participants and beneficiaries is clear from the facts of this case: plaintiff is no longer a member of the Local, but remains a participant in the Fund. Presumably many, if not all, of the beneficiaries would also not be members of the Local.

rental income to be derived from the building, taking an assignment of rents, requiring sureties on the loan, and requiring a principal repayment schedule. The Court cannot say that failure to take any of these steps, standing alone, would constitute such imprudence as to violate a fiduciary's duty. These omissions together do, however, constitute such ·neglectful practice that the Court cannot conclude a prudent investor in similar circumstances would have acted in the same manner. Indeed, the Court is satisfied otherwise. *Cf. Donovan v. Mazzola,* 2 Empl.Ben.Cas. (BNA) 2115, 2133–35 (N.D.Cal.1981) (this section violated by loans made without following standards of "prudent and informed mortgage lenders"); *Marshall v. Glass/Metal Ass'n and Glaziers & Glassworkers Pension Plan,* 507 F.Supp. 378, 384 (D.Hawaii 1980) (this section violated by loans made without following procedures of "prudent lender").

Had the fiduciaries investigated properly, they most likely would have found that the property would be worth less than the amount of the loan, that REBCOR would have no other assets to which the Fund could look for repayment of the loan, that the Local was not legally obligated to supply REBCOR the funds with which to make payments on the loan, and that the rental income would not be adequate to pay the debt service on the loan. Indeed, as the Court has heretofore made reference, Zahn in February 1974 advised the Local membership that the anticipated rental income would be inadequate to service the mortgage. Thus, the failure to investigate led directly to the problems the Fund has experienced with regard to the loan.

■ Finally, there can be little doubt that in serving as Trustees and administrator of the Fund, respectively, while also serving as directors of REBCOR, Nash, Van Fossen, and Zahn violated 29 U.S.C. § 1106(b)(2). Borrowers and lenders constitute a paradigm instance of parties whose interests are adverse. "Fiduciaries acting on both sides of a loan transaction cannot negotiate the *best* terms for either [party]." *Cutaiar v. Marshall,* 590 F.2d 523, 530 (3d Cir.1979) (emphasis in original) (finding violation of ERISA § 406(b)(2)).

■ The plaintiff has not established that the lending Trustees, Zahn, or any other Trustee ever knew a co-fiduciary had committed a breach of fiduciary duties. It follows that none of the defendants are liable under 29 U.S.C. § 1105(a)(1), which makes a fiduciary liable "if he participates *knowingly* in, or *knowingly* undertakes to conceal" a co-fiduciary's breach (emphasis added). Similarly, a fiduciary is liable under 29 U.S.C. § 1105(a)(3) only if he or she knows of a co-fiduciary's breach and fails to remedy it. Absent such established knowledge, the defendants cannot be liable. The Court is loath to encourage ignorance, and the Court feels strongly that in many instances at least some of the fiduciaries *should* have known of the breaches and taken steps to remedy them. The evidence before the Court, however, does not adequately establish the required knowledge.

B. *Noonan, Bowles, and current Trustees.*

The violations plaintiff has proved all concern the initial and supplemental loans. The lending Trustees and Zahn are the defendants liable for these violations. To determine whether these defendants share liability with the other defendants, the Court must examine the remaining allegations, even though proving a single violation by a single defendant might in theory entitle plaintiff to the relief he seeks. For the reasons which follow, the Court concludes that the remaining defendants are not liable. These defendants were faced with circumstances that were fundamentally different from those of their co-defendants. A fiduciary for a financial entity that has almost all its assets tied up in an under-collateralized loan to a borrower with little income simply does not have the same options and considerations as a fiduciary for a financial entity that has nearly one-and-one-half million dollars waiting to be invested in whatever manner the fiduciaries choose.

Again, plaintiff has set forth a litany of actions not taken by the Trustees who suc-

ceeded the lending Trustees. In addition to some of the actions not taken by the lending Trustees, these defendants did not seek to raise the interest rate, foreclose on the notes, seek guidance from an investment manager, etc. No doubt some of the named actions might have been beneficial. The Court cannot say that the Trustees have been as diligent or as imaginative in dealing with the loan as they perhaps could have been. In particular, the Trustees might well have successfully induced REBCOR to begin repaying the principal earlier and in greater amounts than was done. Fairness requires, however, that such a possibility be labeled for what it is—speculative. The Court cannot, on the evidence before it, conclude that the Trustees have been so lax in their duties as to violate ERISA's prudence standards or to indicate they were not acting for the exclusive purpose of providing benefits.

The only way the Trustees could have diversified the plan's investments as required by 29 U.S.C. § 1104(a)(1)(C) and the Virginia Prudent Man Statute incorporated into the Trust documents would have been to divest the Fund of the loan. The evidence before the Court indicates that the Fund would have suffered a greater loss through such divestiture than by retaining the loan and persuading REBCOR to make such payments as were possible. The Court concludes that the Trustees' failure to divest the Fund of the loan so far has been clearly prudent,[20] so that the failure to divest has not violated 29 U.S.C. § 1104(a)(1)(C), (D).

Finally, plaintiff has offered no authority by which the Court could find that either the 1980 waiver of penalties or the continuing failure to raise interest rates could constitute a transfer of assets within

the meaning of 29 U.S.C. § 1106(a)(1)(D), which proscribes the transfer of assets to a party in interest. The Court declines to give such a novel interpretation to this common sense term and declines to impose liability based on plaintiff's notion of economic reality. *Cf. Marshall v. Kelly,* 465 F.Supp. at 351 (finding violation of this section by transfer of tangible assets).

## C. *Cross-Claim defendants.*

The part of the cross-claim that is not barred by the statute of limitations concerns the administration of the loan from November 4, 1976 through January 17, 1977. *See* note 12 *supra* and accompanying text. During that period, as for some time before, REBCOR failed to make interest payments. The evidence indicates the Trustees had no reason to suspect REBCOR was not making the payments, and the Court discerns no basis for finding them liable for the manner in which the delinquent interest built up.

This part of the cross-claim thus pertains only to Zahn. The parties have stipulated that Zahn "was delegated the duty to receive and record REBCOR payments, and to report to the trustees if any difficulties arose." The current Trustees allege that in failing to properly perform such duties, Zahn breached the fiduciary duty set forth in ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Zahn responds that he was not a fiduciary with respect to these duties, as the term is defined in ERISA § 3(21), 29 U.S.C. § 1002(21).

Under the statutory definition, "a person is a fiduciary with respect to a plan to the extent … (iii) he has *any* discretionary authority or discretionary responsibility in the administration of such plan" (emphasis added).[21] The duty to re-

---

20. The Court intimates no opinion as to whether continuing to hold the loan until the note comes due on June 30, 1984 would be prudent. That determination depends, *inter alia,* on further principal payments by REBCOR, prevailing real estate prices, rental incomes, and perhaps the health of the construction industry in the area, as well as other now unforeseeable conditions.

21. The plain language of the statute seems to suggest that once a person is a fiduciary "with respect to a plan" in any capacity, the fiduciary responsibility extends to all functions performed for the plan, however ministerial or discretionary. *But see Fulk v. Bagley,* 88 F.R.D. 153, 161–63 (M.D.N.C.1980). The Court need not, however, decide whether such a blanket fiduciary status exists, because the Court

port any difficulties concerning REBCOR's interest payments included the authority and responsibility for deciding what constituted "difficulties," which is a matter of some discretion. A responsible administrator might not wish to trouble the Trustees if a payment came in a day or two late, but would have to decide at some point that the failure to pay interest properly had become serious enough that the Trustees should know of it. The Court has no difficulty in concluding that Zahn permitted the delinquencies to build up over a much longer period of time and to a much greater level than a prudent person in his position would have.

## V. *Additional Defenses*

The lending Trustees and Zahn have raised various defenses in addition to the statute of limitations defense and the contention that Zahn was not a fiduciary. The Court finds each of these additional defenses to be without merit.

Certain of the lending Trustees assert that the Court is not to overturn the decisions of the Trustees unless it finds them to have been arbitrary and capricious. That standard applies only to review of determinations as to eligibility for benefits. *See, e.g., Seafarers Pension Plan v. Sturgis,* 630 F.2d 218 (4th Cir.1980). The standard for review of the fiduciaries' performance

of their duties is set forth in ERISA § 404, 29 U.S.C. § 1104, and the Court need not look beyond the terms of the statute in reviewing the manner in which the Trustees and Zahn discharged their fiduciary duties.

The lending Trustees also assert that pursuant to ERISA § 414(c)(1), 29 U.S.C. § 1114(c)(1), the original loan was exempt from the prohibited transaction coverage of ERISA § 406, 29 U.S.C. § 1106.[22] Under § 414(c)(1), a party-in-interest transaction may be exempt if, *inter alia,* a binding contract was in effect on July 1, 1974. As of that date, however, all the instant parties had agreed to do was to negotiate concerning a loan. The evidence falls far short of establishing a binding, enforceable contract as of that date.[23]

Finally, the Trustees contend they cannot be liable since they were relying in good faith on the advice of counsel. They have offered no authority to show such reliance constitutes a complete defense. The Court considers the defendants' reliance on the advice of counsel to be simply one of the factors relevant to determining whether they acted with the prudence required by ERISA § 404, 29 U.S.C. § 1104. Even if the fiduciaries interpreted the advice of counsel to mean that the loan would not violate federal law,[24] they were nonetheless bound to evaluate the proposed investment for its merit in helping provide

concludes Zahn exercised discretion with respect to each function for which liability attaches. In the making of the loans, Zahn exercised discretion at least in his capacity as a member of the committee of three that was to evaluate the proposed loan and recommend to the Trustees whether or not they should extend the loan. *See* text accompanying note 6 *supra.*

**22.** Even if this defense were successful, it would only apply to the conflict-of-interest violation of Nash, Van Fossen, and Zahn, since the other § 406 allegations are barred by the statute of limitations.

**23.** In a related contention, the Trustees assert the transaction took place before ERISA's January 1, 1975 effective date, established in ERISA § 414. The Deed of Trust note on the original loan was executed on January 23, 1975. None of the transactions the Court has found to constitute violations occurred before January 1, 1975. And post-1974 violations are

covered by ERISA even if "their roots [can] be traced to an event prior to the effective date of ERISA." *Marshall v. Craft,* 463 F.Supp. 493, 497 (N.D.Ga.1978); *accord, O'Neil v. Marriott Corp.,* 538 F.Supp. 1026, 1033 (D.Md.1982).

**24.** The current Trustees and the Fund have filed a separate action against the Fund's former legal counsel styled *Local 666 Benefit Trust Fund, et al., v. McGuire, Woods & Battle, et al.,* Civil Action No. 82–0221–R. Some of the former Trustees and Zahn have moved to file third-party complaints in this action against the same former legal counsel. The motions will be granted, but the claims will be consolidated for trial with the existing action against McGuire, Woods & Battle et al. The Court's conclusions in the instant matter have no bearing on that action, and the Court intimates no opinion as to the merits thereof.

benefits to the beneficiaries and participants. The Court remains firm in its conclusion that the fiduciaries did not make this evaluation in a prudent manner.

## VI. *Relief*

■■■■■ Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary is personally liable to the plan for any losses resulting from breaches of the fiduciary's duties and is subject to other equitable or remedial relief, including removal from office. Under this provision, the lending Trustees and Zahn are jointly and severally liable for the losses.[25] *See Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 642–44 (W.D.Wis. 1979). There appears to be no way to monetarily measure certain aspects of the injury caused by the breaches. For example, the Fund has been deprived of economic opportunities by having virtually all of its assets tied up in this inferior investment, but the parties have offered no means of measuring the loss of such opportunities caused by this concrete albatross. One type of loss, however, can be measured: the Fund today holds an investment whose value is significantly less than the value prudent investments would bear. That difference in value represents the damage the Fund has suffered.[26]

Plaintiff has submitted affidavits and reports by experts setting the value of the note as of February 28, 1982 at $1,860,000. This valuation represents the sum of the income the note had produced as of that date, $985,000, and the value plaintiff's experts give the security for the note, the Parham Road property, $875,000. Simply

stated, this valuation places at zero the value of REBCOR's promise under the note to pay interest and to repay the principal.[27] By taking into account the value of the property, it is, however, based on REBCOR's one asset from which REBCOR could generate the funds to make such payments. The only evidence before the Court on this issue indicates that this method of valuing the note is the one an investor would use. Since the Court's purpose is to evaluate the note as an investment, the Court accepts this valuation.

In challenging the valuation, the defendants have only challenged the method by which plaintiff's experts valued the Parham Road property. Plaintiff's experts used the "income" approach or "economic" approach, capitalizing the expected income stream from the building. Some of the defendants contend that the proper valuation of the building is $1,250,000, which is the amount for which the current Trustees' expert estimated the property could be sold "through aggressive marketing to potential owner-occupants."[28]

The Court professes to no expertise in the area of real estate valuation. The Court has no means of evaluating whether an "income" approach, "market value" approach, "cost" approach, "liquidation" approach, "aggressive marketing to targeted buyers" approach, or some combination of these approaches would come closest to producing, in some sense, a "true" valuation of real estate. But the evidence before the Court indicates that an investor would apply the "income" approach, and there isn't anything before the Court to suggest that

**25.** The evidence does not establish any means by which any loss caused by the conflict of interest of Nash, Van Fossen, and Zahn can be separated from the loss caused by the other fiduciaries' breaches of duty. The evidence thus indicates that each of the lending Trustees and Zahn are equally responsible for the losses.

**26.** There is no need to wait until the note matures on June 30, 1984 or to liquidate the note to determine its value. The Court will not retain jurisdiction of this action, as some parties have suggested, to see whether the current assessments of value prove accurate. *Cf. Freund v. Marshall & Ilsley Bank,* 485 F.Supp.

at 642–43 (losses realized and ascertainable before liquidation of investment).

**27.** In this manner, the valuation takes into account some of the problematic elements of the loan that resulted from the breaches: deficiency of collateral, lack of any guarantee or other commitment from the Local, lack of a principal repayment schedule (binding or even suggested), history of problems in collecting interest, etc.

**28.** Affidavit of Linwood A. Aron, exhibit 96, at 6 (Dec. 9, 1982).

approach is inherently unreliable. The Court concludes that the calculation of the value of the note as $1,860,000 is accurate.

One of plaintiff's experts also calculated the value as of February 28, 1982, of two real estate loans considered to be of comparable scope, but better structured, as well as the value as of that date of an investment made solely in certificates of deposit.[29] Each of these values is greater than the $1,860,000 value of the REBCOR notes. The expert suggests averaging the differences in value and using the resulting figure, $533,000, as the measure of damages.

The difficulty with the expert's suggested measure is that the plaintiff has given the Court no reason to suppose that the expert's notion of properly structured real estate loans was available to the lending Trustees as an option to the investment they chose. The Court, therefore, will compare the value of the REBCOR notes only with the value of an investment in certificates of deposit, $2,300,800. The difference in value is $440,800; the Court is satisfied that this figure represents the amount by which the Fund has been damaged by the imprudent investment in the REBCOR loans.[30]

The Court finds the other relief plaintiff requests to be inappropriate. In particular, as the Court noted *supra,* the Court is not satisfied that divestiture of the loan is either necessary or desirable at this time. The prudence of such a move must be continually reevaluated as conditions change. *See* note 20 *supra.* The plaintiff's requested relief concerning counsel fees is considered *infra.*

As for the current Trustees' cross-claim, they have only asserted broadly that the cross-claim defendants are liable for any and all loss resulting from their breaches. They have not established the amount of loss the Fund suffered as a result of Zahn's imprudent administration of the loan and lack of diligence concerning interest payments. Indeed, since all of the current Trustees were in office in 1980 when the penalties for such interest delinquencies were ultimately waived, it is not unreasonable to suppose they consider the Fund to be now made whole for such delinquencies.

At any rate, no further monetary damages have been established, and the Court is not satisfied that the further relief requested, such as requiring guarantees or additional collateral, is appropriate. Such additional relief would amount to double recovery, since the absence of such measures was part of the basis for the valuation of the REBCOR notes. *See* note 27 *supra* and accompanying text. Since the current Trustees have failed to establish any recoverable damages on their cross-claim, *see also* Part VII *infra,* judgment will be entered in favor of the cross-claim defendants. The current Trustees' contentions in regard to counsel fees remain to be considered.

## VII. *Counsel Fees*

This case, despite its facade, is not about fiduciary duties or providing health and welfare benefits or prudent investments or conflicts of interest. This case is about counsel fees. The Court has set the amount of damages at $440,800; the Court has no doubt that the total legal fees generated by this action already amount to some obscene

---

**29.** In calculating this present value, the expert did not compute the amount of income that could have been generated by reinvesting the interest from these certificates. However, in calculating the present value of the REBCOR note, the expert also did not compute the amount of income that could have been generated by reinvesting the interest and principal payments received. In each instance, the expert assumed such payments would be applied to the Fund's current needs. The two figures thus can be compared with no distortion.

**30.** The figure need not be adjusted for the amount of any principal payments made since

February 28, 1982 because the comparison with the alternative investment was made as of that date. The Fund apparently has also suffered a loss in the amount of $159.25, the amount of interest it had to pay on borrowing made necessary because of the amount of the Fund's assets tied up in the REBCOR loan. Because this element of damages is so minor, and because the $440,800 figure is necessarily based on estimates and inherently uncertain appraisals, the Court deems this element to be included in the $440,800 figure.

multiple of that figure. From the beginning, this case has been characterized by excessive representation.[31] The majority of the parties, including the plaintiff, have found it necessary to be represented by two or more *teams* of lawyers. Now each of the parties seeks to have someone else pay for such representation.

Unfortunately, the Court cannot dispose of all of these claims entirely on the present record. For example, certain defendants have filed third-party complaints against Aetna Life and Casualty Company and The Standard Fire Insurance Company asserting that pursuant to a policy of fiduciary insurance,[32] the third-party defendants had a duty to defend them in this action. These third-party complaints have, in effect, been severed from the principal action. *See* note 1 *supra.* The Court can, however, consider certain of the contentions.

■ Pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the Court will allow plaintiff to collect *reasonable* counsel fees from the lending Trustees and Zahn. Applying the standard set forth in *Tenneco Inc. v. First Virginia Bank,* 698 F.2d 688 at 689 (4th Cir.1983)[33] the Court finds as follows: (1) these defendants are culpable in causing significant loss to the Fund; (2) their abili-

ty to pay fees is unknown to the Court; (3) there is reason to hope an award of counsel fees in this instance will deter others; (4) most significantly, the plaintiff has sought to benefit the Fund as a whole (though the Court is less convinced of the altruistic motives of plaintiff's counsel); and (5) the plaintiff is entitled to prevail on the merits. The plaintiff will be directed to confer with these defendants in an attempt to settle on an amount for such fees. Of course, plaintiff will not be allowed to recover counsel fees for any duplicative work performed by his various teams of lawyers or for work performed in pursuit of his unsuccessful claims.

The current Trustees have requested, as an element of the damages sought in their cross-claim, that the former Trustees be made to bear the costs of defending this litigation. Of course, the cross-claim established liability only against Zahn. But at any rate, the current Trustees have not shown that any breaches of duty proximately caused the litigation to transpire. The Court cannot surmise what motivated the plaintiff to file suit. But from the evidence, it appears at least equally likely plaintiff filed suit in frustration after re-

---

**31.** At times, the excessive representation has been nearly as comical as wasteful. For example, one defendant, rather than simply joining in the memorandum filed by another defendant who had the same interests, filed a virtually identical memorandum. Unfortunately, in one place he slipped and failed to substitute his own name for the other defendant's. The Court cannot imagine a reason for filing this memorandum other than to generate legal fees. *See also* note 5 *supra.*

The courtroom was so fully occupied with lawyers at the hearings that, if the Court may borrow an expression without being able to name the source, when one lawyer would sneeze, the "Gesundheits" would take up six pages of transcript.

The Court will, at the appropriate time, consider invoking the sanctions provided for in 28 U.S.C. § 1927. Fairness mandates an expression by the Court that at least some of the efforts expended by certain of the counsel were made necessary by the unnecessary efforts of some of their brethren.

**32.** The policy is alleged to have covered the fiduciaries from May 25, 1977 to May 25, 1978. Since the Court has found none of the defend-

ants liable for any actions taken during that period, there should be no dispute concerning any claims for indemnity under the policy.

**33.** In *Tenneco Inc.,* the Fourth Circuit adopted the test for awarding counsel fees pursuant to ERISA § 502(g) that was set forth in *Iron Workers Local # 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980), under which the Court is to consider

such factors as the following: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Id.* (footnote omitted).

ceiving high-handed treatment from the current Trustees when he made inquiries about the REBCOR loan.

 In accordance with the discretion provided the Court in ERISA § 502(g), 29 U.S.C. § 1132(g), the Court will not award counsel fees to the current Trustees. As to plaintiff's unsuccessful claim against them, they have not so much prevailed as eluded liability. As to their cross-claim against the lending Trustees and Zahn, they have failed to establish a right to any relief, and they certainly have conferred no benefit upon the Fund beyond what the plaintiff has brought about. Applying the *Tenneco Inc.* standard, *see* note 33 *supra,* to the plaintiff's claims against the current Trustees in the principal action, (1) the Court finds no reason to conclude that the plaintiff brought his action against the current Trustees in bad faith; (2) he apparently has little ability to pay fees; (3) his efforts do not call for deterrence; (4) the current Trustees sought to benefit the entire Fund in opposing plaintiff only to the extent he sought remedies they believed would harm the Fund, but they also sought to protect their own positions; and (5) the merits of the parties' positions have been resolved in favor of the current Trustees. On balance, no counsel fees are called for. To the extent the *Tenneco Inc.* factors apply to the cross-claim, they are satisfied by plaintiff's recovery of counsel fees in the principal action.

Finally, the plaintiff has requested, as part of his relief, that the defendants be required to reimburse the Fund for any legal representation the Fund has provided them and that the Court order that no defendant be indemnified by the Fund for his costs of defending in this action. The record does not reflect whether the Fund has, in fact, paid for any such representation.[34] The Court will direct the parties to submit evidence as to any such payments and to submit arguments and supporting authorities as to whether such relief is appropriate.

An appropriate order will issue.

34. In general, the parties have reserved the issues relative to counsel fees.